Burl D. PILGRIM and Martha Pilgrim,
Plaintiffs-Appellees,

v.

FORTUNE DRILLING COMPANY, INC.,
Defendant-Appellant.

No. 80–1710.

United States Court of Appeals,
Fifth Circuit.
Unit A

Aug. 17, 1981.

Rehearing Denied Oct. 1, 1981.

Fillmore & Camp, H. Dustin Fillmore, Richard L. Scheer, Randy J. Hall, Fort Worth, Tex., for defendant-appellant.

Donald W. Griffis, San Angelo, Tex., for plaintiffs-appellees.

Before REAVLEY, RANDALL and SAM D. JOHNSON, Circuit Judges.

REAVLEY, Circuit Judge:

In this diversity case, defendant, Fortune Drilling Company, Inc., appeals an adverse judgment rendered after a jury trial, holding it both primarily and vicariously liable for the injuries of plaintiff, Burl D. Pilgrim, which were sustained when his vehicle was struck by a pickup truck owned and driven by Elbert Pillow, an employee of defendant.[1] We reverse.

### I.

The accident which is the basis of this suit occurred on May 25, 1977, about two miles south of Sonora, Texas on U. S. Highway 277 at approximately 7:30 in the morning. Pillow, who was employed by Fortune as a motorman on a drilling crew, had just finished work at 7:00 a. m. and was driving his truck home from the drilling rig when he struck the rear of plaintiff's pickup truck, causing it to leave the highway and plunge into a ravine. As a result, the plaintiff suffered severe injuries which have left him a paraplegic confined to a wheelchair.

At the time of the accident Pillow's home was in Iraan, Texas, which is approximately 117.5 miles from the location of the drilling rig at which he worked. The accident occurred about 15.5 miles from the drilling rig.

Fortune's drilling crews at the rig near Sonora worked twelve hour shifts and were off for twenty-four hours. Three crews worked the rig near Sonora to keep it operating twenty-four hours a day, seven days a week. Because the crews worked twelve hours and then were off twenty-four, they constantly alternated between day and night shifts.

Pillow testified that it was a three hour drive from his home in Iraan to the drilling rig location. This meant that on top of his twelve hours of work at the drilling rig, Pillow drove six hours to and from the rig each shift he worked. Fortune did not provide the crew members with any kind of living quarters at the rig location where, after a tiring day's work, an employee could rest before making the long drive home.[2] Nor did Fortune provide transportation for its drilling crews from their homes to the drilling rig site.[3]

However, Fortune did pay a travel allowance of $25 a day to one member of each crew at each of its drilling rigs. The executive vice president of Fortune during the time of the accident testified that it was not necessary for the person who received the travel allowance to have driven his automobile from his home to the rig location on the day for which the allowance was paid, but that, for each crew, the members decided among themselves who would receive the travel allowance for the day.

The uncontradicted testimony of Fortune's executive vice president was that the drilling crew members were not on the payroll while they were traveling to and from their work sites. He further testified that, as part of their contract of employment, Fortune had no right of control over the activities of its drilling crew employees once they finished their day's work and left the

---

1. The employee, Pillow, although not a party to this appeal was a defendant and third-party defendant below.

2. Fortune did, however, provide a small house-trailer for use by the toolpusher (foreman) and the geologist at the drilling rig site.

3. The record reveals that all but one of the employees on the drilling crew of which Pillow was a member lived in Iraan. The single crew member who did not live in Iraan lived in Sheffield, Texas, which was some distance farther from the drilling rig location on the route traveled by Pillow and the other crew members. The testimony suggests that for the most part the drilling crew members "car pooled" from Iraan to the drilling rig location.

drilling rig site. Pillow's testimony confirmed this.[4]

The case was submitted to the jury for the return of a special verdict under Fed.R. Civ.P. 49(a). The jury found Pillow to have been negligent in his speed, in the application of his brakes, in his lookout, and in failing to maintain an assured clear distance between his pickup and the pickup driven by plaintiff. With respect to Fortune Drilling Company, the jury found that it was negligent "in permitting its employees to go out on the highways when they were in such an exhausted condition as to create an unreasonable risk of harm to others."[5] Both Pillow's and Fortune's negligence were found to have been a proximate cause of the accident in which plaintiff was injured. Moreover, the jury found that, at the time of the accident, Pillow was an "employee acting in the course of his employment" for Fortune Drilling Company. The district court entered judgment on the verdict, holding Pillow and Fortune to be jointly and severally liable.[6]

## II.

Fortune first contends that the district court erred by submitting to the jury the question of its primary negligence and by entering judgment against it on the jury's findings that it was negligent "in permitting its employees to go out on the highways when they were in such an exhausted condition as to create an unreasonable risk of harm to others." Fortune argues that as a matter of law it could not have been negligent in this respect since it owed no duty to the plaintiff. We agree.

Since jurisdiction in this case is based on diversity of citizenship, Texas law controls.

*Erie Railroad Company v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The plaintiffs candidly admit that no Texas appellate court has recognized the duty on the part of an employer to prevent his employees from driving when the employer knows, or in the exercise of ordinary care should know, that due to prior working conditions his employees are so tired that they cannot be safe, alert and competent drivers and, hence, would create an unreasonable risk of harm to others using the highways. We, therefore, occupy the position of deciding this case as the Texas courts would if confronted with these facts and circumstances. *See Stevens Industries, Inc. v. Maryland Casualty Co.*, 391 F.2d 411, 413 (5th Cir. 1968). In "the always-dangerous undertaking of predicting what Texas courts would hold if the issue were presented squarely to them," *Stephens v. State Farm Mutual Automobile Ins. Co.*, 508 F.2d 1363, 1366 (5th Cir. 1975), we are *Erie*-bound to look to all available data; for example, to such sources as the Restatements of Law, treatises and law review commentary, keeping in mind that we must choose the result which we believe the state court would be most likely to reach. *Putnam v. Erie City Manufacturing Co.*, 338 F.2d 911, 917 (5th Cir. 1964).

■ It is well-settled under Texas law that negligence consists of the failure to observe a legal duty, and a "plaintiff must prove the existence and violation of a legal duty owed to him by the defendant to establish tort liability." *Abalos v. Oil Development Co. of Texas*, 544 S.W.2d 627, 631 (Tex.1976); *Coleman v. Hudson Gas and Oil Corp.*, 455 S.W.2d 701 (Tex.1970). In their complaint, the plaintiffs alleged that For-

---

4. Pillow stated that, under his contract of employment with Fortune, once he finished a shift he was not subject to the company's control in any respect and that he could go wherever and do whatever he wanted.

5. The plaintiffs' theory for the cause of the accident was that Pillow, after having worked a twelve hour shift as an oil rig worker, had fallen asleep at the wheel during his long drive back to his home in Iraan. One of plaintiffs' witnesses testified that Pillow had told him,

right after and at the scene of the wreck, that he had dozed off at the wheel. Pillow disputed this and offered a different explanation as to how the accident occurred.

6. The judgment was for $842,001.64, which was the amount of damages that the jury found plaintiffs sustained. The jury found 60% of the negligence that caused the accident to be attributable to Pillow and 40% to be attributable to Fortune Drilling Company.

tune's nonfeasance was a proximate cause of the accident, that is, that Fortune failed to prevent Pillow from driving on the highways when its supervisory personnel knew or should have known that Pillow was so exhausted from work that his driving home would create an unreasonable risk of harm to other motorists. Under Texas law, nonfeasance is that species of negligence consisting of the failure to do an act which a person is under a duty to do and which a person of ordinary prudence would have done under the same or similar circumstances. *See Great Atlantic & Pacific Tea Co. v. Evans,* 142 Tex. 1, 175 S.W.2d 249, 250–51 (1943). Therefore, a prerequisite to Fortune's liability under the theory of primary negligence is whether it owes a duty to users of the public highways to prevent its employees from driving home when they are so exhausted from working that their driving would create an unreasonable risk of harm to others.

A duty to control the conduct of another presupposes that the right to exercise such control exists. The extent to which an employer has the right to control the conduct of his employees depends upon the peculiar circumstances of the employment relationship with respect to each individual employee. It is elementary, though, that an employer possesses the right and duty to control the conduct of an employee while the employee is acting within the course of his employment. We conclude, however, on the basis of this record, that Pillow was acting outside the course and scope of his employment with Fortune when he was driving home from work on the day of the accident.[7] Therefore, we must determine whether, under Texas law, Fortune had a right to control the conduct of its employees when they were no longer in the course and scope of their employment as drilling crew members, *i. e.* to prevent them from driving home if they are too exhausted to drive after a day's work.[8] Absent such a right of control, there can be no duty to control.

Restatement (Second) of Torts § 317 sets forth circumstances under which an employer has a duty to control the conduct of an employee who is outside the scope of his employment. Section 317 states:

"A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if

(a) the servant

(i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or

(ii) is using a chattel of the master, and

(b) the master

(i) knows or has reason to know that he has the ability to control his servant, and

(ii) knows or should know of the necessity and opportunity for exercising such control."

Comment b to § 317 states:

"[A] master as such is under no peculiar duty to control the conduct of his servant while he is outside of the master's premis-

---

7. *See* discussion under section III, *infra.*

8. In their brief plaintiffs argue that "[i]t is negligent to allow a fatigued employee to drive on the public highways." They then suggest that "[t]he duty is to furnish transportation to exhausted employees, furnish sleeping quarters near the work site, reduce working hours, or otherwise supply alternatives to exhausted employees driving on public roads." We are not concerned here whether it is negligent for an employer to fail to furnish transportation to exhausted employees, to fail to provide sleeping quarters near the work site so exhausted employees can rest before driving, to fail to reduce working hours, or to otherwise fail to supply alternatives to exhausted employees driving on public roads. We are only concerned with whether it was negligent for this employer to *permit* its employee to drive home in an exhausted condition. That is the legal theory involved in the special issue submitted to the jury. We express no opinion on whether an employer could be negligent by failing to provide transportation to exhausted employees, to furnish sleeping quarters to them, etc. since we do not have that question before us.

es, unless the servant is at the time using a chattel entrusted to him as servant. Thus, a factory owner is required to exercise his authority as master to prevent his servants, while in the factory yard during the lunch hour, from indulging in games involving an unreasonable risk of harm to persons outside the factory premises. He is not required, however, to exercise any control over the actions of his employees while on the public streets or in a neighboring restaurant during the lunch interval, even though the fact that they are his servants may give him the power to control their actions by threatening to dismiss them from his employment if they persist."

At the time of the accident involved in this case, Pillow, although an employee of Fortune, was neither upon premises owned or possessed by Fortune nor was he using a chattel owned by Fortune. Instead, he was driving his own vehicle on the public streets. Moreover, the evidence makes clear that Fortune had no legal ability—no right—to exercise control over its employees after their shift was over by detaining those employees it determined to be too exhausted to drive.

Pillow testified that, under his employment contract with Fortune, he was not subject to control by the company in any respect once he had finished his day's work. The testimony of Fortune's executive vice president confirmed this. He stated that, once the men on the drilling crews finished their shifts, the company had no right of control over them under their contract of employment. He further testified that Fortune's employees were not on the payroll while they were traveling to and from work sites and that the company did not direct or instruct its employees in any regard as to how they commuted to and from work.

A reading of this record reveals that the individual members of Fortune's drilling crews were solely responsible for their travel to and from work. In fact, there is testimony that some members of other drilling crews working on Fortune's rig near

Sonora opted not to make the long daily drive at all; instead, they camped out near the drilling rig since all the motels in Sonora were full.

Because we believe the Texas courts would extend liability no further than Restatement (Second) of Torts § 317, see Kelsey-Seybold Clinic v. Maclay, 466 S.W.2d 716, 720 (Tex.1971); Nealy v. Fidelity Union Life Insurance Co., 376 S.W.2d 401, 403 (Tex.Civ.App.—Dallas 1964, no writ), we hold that Fortune was under no duty to prevent its employees from driving home when they became exhausted from their day's work. Cf. Sanchez v. United States, 506 F.2d 702 (10th Cir. 1974).

### III.

Fortune next contends that the district court erred in rendering judgment in favor of plaintiffs since, as a matter of law, it could not be vicariously liable for Pillow's negligence under the evidence adduced at trial. Again, we agree.

In order for a master to be held liable under respondeat superior for the negligent acts of his servant, it must be shown (1) that an employer-employee relationship existed between the master and the tortfeasor and (2) that the negligent act was done in the scope and course of the tortfeasor's employment. Specifically, under Texas law, a master is liable for the negligent acts of his servant under the doctrine of respondeat superior "only where the relationship of master and servant exists at the time and in respect to the very thing causing the injury and from which it arises." American National Insurance Co. v. Denke, 128 Tex. 229, 95 S.W.2d 370, 373 (1936). Moreover, the test of a master's liability for the negligent acts of his servant is whether the master had the right and power to direct and control the servant in the performance of the causal act or omission at the very instant of the negligence. Id.; Parmlee v. Texas & New Orleans Railroad Co., 381 S.W.2d 90, 94 (Tex.Civ.App.—Tyler 1964, writ ref'd n. r. e.). After carefully reviewing this record, we are unable to find any evidence that Fortune possessed

the right and power to direct and control its employee, Pillow, in the performance of his driving to and from work.[9]

Indeed, the rule at common law and in Texas is that, absent a contractual provision to the contrary, the master owes his servant no duty to furnish him a way to the master's premises; instead, the servant must make the choice, and while using the way selected by him, the relationship of master-servant does not exist. *Rio Bravo Oil Co. v. Mathews*, 20 S.W.2d 342, 345 (Tex.Civ.App.—Beaumont 1929, no writ). The courts in Texas have clearly adhered to the principle that getting to and from the place of work is ordinarily a personal problem for the employee and not part of his services to his employer.[10] Hence, in the absence of some special benefit to the employer—other than the mere making of the employee's services available to the employer at his place of business—the rule in Texas is that an employee is not acting in the course and scope of his employment while traveling to and from work, and that the employer ordinarily cannot be held vicariously liable to one injured by the employee's negligent operation of an automobile during these trips to and from work. *See, e. g., Moye v. United States*, 218 F.2d 81, 83 (5th Cir. 1955); *Kuykendall v. United Gas Pipe Line Co.*, 208 F.2d 921, 923 (5th Cir. 1953); *Salmon v. Hinojosa*, 538 S.W.2d 22, 24 (Tex.Civ.App.—San Antonio 1976, no writ).

It is apparent from a reading of Texas cases that the fact that the employee is on his way to work, which will mutually benefit both employer and employee, is not sufficient in and of itself to constitute a mission undertaken for the benefit of the employer, the effect of which would be to remove the situation from the general rule that an employer will not be vicariously liable for the employee's negligence while traveling to and from work. The plaintiffs argue, however, that this is not the ordinary case of a commuter traveling a few miles from his home in the suburbs to his place of employment in the city. Instead, they assert, it is a case of the employee living 117 miles from the place of his employment and that Fortune benefited from having its employees travel from distant cities to its remote work site.

We are not persuaded that the Texas courts would be amenable to plaintiffs' argument. All employers derive the same common benefit from the fact that employees travel varying distances to make their services available to their employer at his place of business. An increase in distance from an employee's home to the employer's place of business is not sufficient to create a mission for the special benefit of the employer that would except the employer from the general rule that he will not be liable for his employee's negligence while going to and from work under the doctrine of respondeat superior. *See Parmlee v. Texas & New Orleans Railroad Co.*, 381 S.W.2d 90 (Tex.Civ.App.) (in which the court held that an employee was not in the scope and course of his employment for purposes of imposing vicarious liability on his employer, where the employee was driving from San Antonio to McAllen—a distance of approximately 238 miles—from his home to his work assignment as a locomotive engineer);[11] *American National Ins.*

---

**9.** Instead, the uncontroverted testimony was that Fortune had no right or power to exercise control over its employees once their shifts had ended and once they left the drilling rig site. *See* section II, *supra*, for a discussion of the testimony of Pillow and Fortune's executive vice president to the effect that once a day's work had ended, the employees could go wherever and do whatever they wanted.

**10.** Fortune's executive vice president testified that the company was in no way concerned with how its employees got to the work site. The record demonstrates at least two alterna-

tives to each individual employee driving the long distance to and from work in his own personal car: (1) most employees on Pillow's crew apparently "car pooled," and (2) employees on other crews camped out near the drilling rig.

**11.** The court noted that there was no evidence that the employer had a right to control the conduct of its employee or the use of his automobile on the day of the accident. Therefore, the court held that it followed that the employee was not acting in the course and scope of his employment for his employer and that no liabil-

*Co. v. O'Neal,* 107 S.W.2d 927, 928 (Tex.Civ. App.—San Antonio 1937, no writ) (where the court noted that an employer is not liable for the negligent acts of his employees while they are going to and from work and that there would be "no distinction whether the employee lived one mile or one hundred miles from the place of his employment").

In support of their argument that Fortune should be liable under the doctrine of respondeat superior, plaintiffs rely heavily on the fact that Fortune paid a travel allowance to one member of the drilling crew each day. We are satisfied that the Texas courts would not deem this fact a sufficient basis for imposing vicarious liability on Fortune. Under Texas law "an employee is not acting within the scope of his employment while going to and from work, even though he uses his employer's vehicle as the means of transportation." [12] *Salmon v. Hinojosa,* 538 S.W.2d at 24 (Tex.Civ. App.). A different rule should not prevail where the employer provides a travel allowance to an employee who drives his own automobile to work.[13]

The judgment of the district court is reversed; the case is remanded to the district court with instructions that judgment be rendered in favor of the appellant, Fortune Drilling Company.

REVERSED and REMANDED.

---

ity attached to the employer for the employee's negligence. 381 S.W.2d at 96.

**12.** Texas law creates a presumption that, when the automobile is owned by the employer and when an employer-employee relationship exists between the employer and the driver of the automobile, the driver of the vehicle was acting within the scope and course of his employment at the time the accident occurs. *Robertson Tank Lines, Inc. v. Van Cleave,* 468 S.W.2d 354, 357 (Tex.1971). The presumption is rebuttable by the introduction of evidence to the effect that the servant was not engaged in the master's business at the time of the accident.

The plaintiffs rely on *Texas Power & Light Co. v. Evans,* 225 S.W.2d 879 (Tex.Civ.App.—Dallas 1949, no writ), in which the court held that based on the evidence presented it was a question of fact for the jury whether an employee was acting in the scope of his employment when he drove his employer's vehicle from the employer's place of business to his home to pick up his wife, who also worked for the employer, and drive her to work. However, *Evans* was decided several years before the Texas Supreme Court handed down its decision in *Robertson Tank Lines,* holding that the employer's ownership of the vehicle and the fact of the driver's employment will not support the conclusion, or even an inference, that the driver was acting in the scope of his employment once the presumption is rebutted. The evidence in *Evans* would appear to have been sufficient to rebut the presumption, *see Salmon v. Hinojosa,* 538 S.W.2d at 23–24, but this was not discussed by the court in *Evans.* Instead, the court emphasized that under the evidence a jury could reasonably have found that it was for the employer's benefit to have the wife, the cashier at the utility's office, at work on time. The facts were that the streets were icy and slick that morning, that the employee who was driving the employer's vehicle was the manager of the utility's local office, and that because of the importance of his wife's duties as cashier, he could have concluded as manager that it was necessary to leave the office to drive her to work. 225 S.W.2d at 882. We think the fact that the employee in *Evans* was a manager and that he was driving his employer's vehicle are sufficient to distinguish the *Evans* case from the one before us.

**13.** *Cf. American General Insurance Co. v. Coleman,* 157 Tex. 377, 303 S.W.2d 370, 374 (1957) (in which the court holds that evidence which does nothing more than raise an inference that the employer has paid an injured employee for this travel time cannot, in absence of proof that on the trip the employee was to perform some service for the employer, bring the employee's injuries sustained during the trip under the coverage of the worker's compensation statute).